MARY E. H. BLEW v. PEARL V. COLLINS.[1]

June 25, 1895.

Nos. 9327—(205).

Contract—Interpretation.
    A contract construed.

Action in the district court of Hennepin county to recover an unpaid balance of $2,303.32, and interest, upon the contract mentioned in the opinion. When the plaintiff rested at the trial a motion to dismiss the action was denied. The court ordered judgment in favor of the plaintiff for $1,934.02. From an order of the court, Hicks, J., denying a new trial, defendant appealed. Reversed.

Douglas A. Fiske and Ell Torrance, for appellant.

Groesbeck & Merritt, for respondent.

MITCHELL, J.[2]   The determination of most of the questions raised by this appeal depends upon the construction of the contract of the parties,—Exhibit A of the answer. This contract is unreason-

---

[1] Reported in 63 N. W. 1091.        [2] Buck, J., absent, took no part.

ably prolix, and, in many of its provisions, ambiguous and involved, and hence difficult to construe. Much of the trouble arises from the fact that the so-called "main agreement" appears to have been first drawn up with the expectation that it would become the contract of the parties, but, when they subsequently agreed upon the terms of an entirely different contract, the scrivener, instead of preparing an entirely new instrument, merely attached the so-called "supplemental agreement," and attempted to make its language fit into the provisions of the original or "main" instrument. As it is not probable that any other contract will ever be found like this, it will subserve no good purpose to do much more than state the conclusions at which we have arrived.

1. The first and most important matter of construction is that upon which depends the determination of the question which party had the burden of proof. Plaintiff's contention is that the contract fixes the price which defendant was to pay for the stock at $7,000, subject, however, to "credits" in case it should be made to appear from the books of account that the net profits of the business for the year ending May 30, 1893, were less than $1,500, and that the burden was on defendant to prove that he was entitled to any such "credits." On the other hand, the defendant's contention is that the contract does not fix the amount of the purchase price, but merely provides a rule by which it should be ascertained, and that the burden was on plaintiff to prove, as a part of her cause of action, how much it would amount to, on the basis of computation provided for.

The main agreement contemplated a sale of the 250 shares of stock for $7,000,—that is, $28 per share; part to be paid down, and part in monthly instalments; 72 shares to be assigned and delivered presently, 50 more when certain further partial payments were made, but the remaining 128 shares not to be delivered until the whole $7,000 was paid. While this instrument fixed the purchase price, unconditionally, at $7,000, yet it appears from the recitals in the supplemental agreement that this sum was named on the assumption that the net profits of the business for the year ending May 30, 1893, had been $1,500. But before closing the deal the parties finally agreed that the purchase price should, within certain limits, be determined by the amount of the profits of the business, as shown by the books themselves, which were to be examined for that purpose by one Wendell,

as an expert accountant. To carry this into effect the supplemental agreement was then drawn, which, after reciting substantially as above, provides as follows: "If the total profits for said year * * * fall below $1,500, in that event, second party [defendant] shall be entitled to a further credit upon the $7,000, the purchase price of the capital stock bought in the above contract, computing and allowing as such credit $4.66 for each and every dollar below $1,500 which the report of said Wendell shows the profits of said year, the same to be credited as payment on the 128 shares of stock last to be delivered to him."

It is clear that the intention of the parties was (1) that in no event should the purchase price exceed $7,000, or $28 a share; (2) but that, if the profit of the business should be found to be less than $1,500, the price should be less than that sum. And, in view of the last clause above quoted, construed in connection with other provisions of the contract, we are also of opinion that it was the intention of the parties that this reduced price should only apply to the last 128 shares to be delivered to the defendant, leaving the other 122 shares to be paid for, in any event, at the rate of $28 per share, which would amount to $3,416. But, within these limits, the price was to be fixed on the basis of the profits of the business, as shown by the books. The words used in the contract, taken literally, lend an air of plausibility to plaintiff's contention; but looking at the intention of the parties, and construing the various provisions of the instrument according to their legal effect, it seems to us that the contract, when reduced to its lowest denomination, was that defendant should pay $4.66 for each dollar of profits of the business for the year ending May 30, 1893, provided, however, that in no event should the total purchase price be more than $7,000 or less than $3,416. At least, that is as near as we can come to determining the intention of the parties.

It follows from this that, if plaintiff claimed that the price amounted to more than the smaller sum, the burden was on her to prove it. The plaintiff admitted a payment of $2,516, and a counterclaim of about $365. Hence, as the evidence stood, there appeared to be due her only a little over $500, as we figure it. Therefore, while the court was right in denying the motion to dismiss the action, it erred

in finding that there was due to plaintiff the sum of $1,934.02. There was no evidence to sustain this finding.

2. The court seems to have excluded the report of Wendell principally upon the ground that he had exceeded his authority in giving his estimated actual value, instead of the face value, of accounts "earned and uncollected." This does not appear from the face of the contract, and we hardly think it appears from evidence aliunde. But, if the parties themselves authorized Wendell to estimate these accounts in his report at $750, he would have a right to do so, and defendant had the right to prove the fact without specially pleading it. But there is an objection to the report which, although it may at first seem trivial, is nevertheless substantial. The contract was that Wendell should make a report of the profits, as shown by the books, for the year ending May 30. The evidence shows that his report is for the year ending May 31. The variation of a day in the beginning and ending of the year might make a material difference in the amount of profits as shown by the books, and every dollar's difference in the profits would make a difference of $4.66 in the price to be paid for the stock. Therefore, we do not think the report was admissible without first proving that this departure from the terms of the contract was made with the consent or by the authority of the parties.

3. As bearing upon the question when the first monthly payment became due, we think the contract should be construed as speaking as of the date of its execution, which, of course, includes delivery; and therefore, under a different state of the pleadings, evidence would have been admissible to show that, although dated June 7, it was in fact not executed until June 13, and hence that no payment became due June 10, 1893. But the evidence was properly excluded because defendant himself admitted and alleged that the contract was entered into June 7.

4. By the terms of the contract, the plaintiff assumed and agreed to pay any outstanding indebtedness of the company contracted before the defendant assumed control and management of the corporation and its business. The business was publishing a newspaper, and, while the transaction between the parties was primarily and nominally a purchase of the entire stock of the corporation, it was in effect

a purchase of this newspaper, which was a going concern.    The de-
fendant offered to prove that when he assumed control of the busi-
ness there were outstanding and uncompleted advertising contracts,
the performance of which he had to complete, but for which the com-
pany had been fully paid in advance.    We are of opinion that these
contracts did not constitute an "indebtedness" of the company, with-
in the meaning of the contract.    After the business was transferred
to defendant, plaintiff could not pay or perform these contracts.  The
most she could do would be to reimburse defendant for doing so.

It is a matter of common knowledge that there is rarely, if ever, a
time when, in the newspaper business, there are not outstanding, un-
completed advertising contracts, on some of which more, and on
others less, has been paid, that is an equivalent for the part already
performed by the proprietors of the paper.    In case of a transfer
of the business, it would be difficult, if not impracticable, to adjust
all these matters up to date, with exactness.    The natural, and we
think the usual, way, would be for the purchaser to take the business
subject to all these contracts, just as they stood, and we think that
the fair construction of this contract is that this was the agreement
of the parties in this instance.    Nor do we think that a subsequent
admission of the plaintiff would be admissible for the purpose of
establishing a different "practical construction."

This disposes of all the material points raised by the assignments
of error, but, with a view to a possible second trial, we wish to refer
to one position taken by counsel for plaintiff.    His contention is that
defendant was entitled to a "credit" on the $7,000 only on condition
that Wendell reported, in the manner provided by the contract, that
the books showed that the profits were less than $1,500, and there-
fore, if he failed or refused to act at all, or acted in a manner not au-
thorized by the contract, defendant is bound to pay the full $7,000.
This position is not sound.    Wendell was designated as an expert
accountant to ascertain and report what the books showed.    In
case of his failure to act, or his failure to ascertain and report the
amount of the profits in accordance with his authority, the parties
may do it for themselves, and prove on the trial, by any competent
evidence, just what Wendell should have ascertained and reported.

Order reversed, and new trial granted.